388 F.2d 596
 UNITED STATES of America, Petitioner-Plaintiff-Appellant,
v.
CERTAIN PROPERTY LOCATED IN the BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, and 193 Realty Corp. et al., Defendants-Appellees.
 No. 194.
 Docket 30832.
 United States Court of Appeals Second Circuit.
 Argued November 22, 1966.
 Decided August 25, 1967.
 On Rehearing In Banc January 24, 1968.
 
 Edwin L. Weisl, Jr., Asst. Atty. Gen. (Harry T. Dolan, Sp. Asst. to the Atty. Gen., Brooklyn, N. Y., Roger P. Marquis and Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellant.
 George Bergen, New York City (Skinner & Bermant, Leddy & Raber, New York City, on the brief), for appellee Alto-Craft Wood Products Corp.
 Leon Liner, Goldwater & Flynn, New York City, for appellee Treitel-Gratz Co., Inc.
 Arthur D. Goldstein, Samuel Goldstein & Sons, New York City, for appellees, Jacob Daitchburg and George Deutsch.
 Donald S. Goldberg, New York City (Albert Kreindler, New York City, on the brief), for appellees Pardini-Bertoli Fine Furniture, Inc., and others.
 Before WATERMAN, MOORE and HAYS, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 This is an appeal by the United States from a September 30, 1965 judgment of the United States District Court for the Southern District of New York entered upon an unreported memorandum opinion of July 1, 1965 confirming awards made by commissioners in favor of thirteen tenants of buildings situated on land condemned for use as a United States Post Office site. The awards were for the value of trade fixtures claimed by the tenants to be compensable under the rules laid down by the district court in its reported opinion, 225 F.Supp. 498 (SDNY 1963, 1964), concerning these premises.
 
 
 2
 The condemnation complaint was filed on July 26, 1962; and an amended complaint and declaration of taking were filed on September 30, 1963 specifying that the interest to be taken was "an estate in fee simple to said land together with the improvements thereon and appurtenances thereto, including all estates and interests therein, excepting, however, tenants' removable trade fixtures." The issue of just compensation was determined by three commissioners appointed under the provisions of Fed. R.Civ.P. 71A(h) who made their report granting awards as to both the fee and the tenants' interests, including the tenants' fixtures. The district court confirmed the awards of the commission stating that the commissioners' conclusions "on the fixture claims are in accordance with the law as determined in the two opinions of the Second Circuit in United States v. Certain Property, etc., 306 F.2d 439 and 344 F.2d 142." The Government appeals from these awards to the tenants. It also appealed in a related case, United States v. Certain Property, 374 F.2d 138 (2 Cir. 1967) from awards to the fee owners.
 
 
 3
 The appellee tenants are business concerns who occupied premises in buildings on the condemned land under leases granted to them by the freeholders. The leases were all short term leases without renewal options; seven had expired prior to the date of taking, September 30, 1963, four expired within six months after the taking, and the remaining two expired 19 months after the taking.
 
 
 4
 The issue before us concerns the payment of compensation to these tenants for their fixtures. The district court found the fixtures involved to be "removable trade fixtures" and compensable under the standards we set forth in United States v. Certain Property, 306 F.2d 439 (2 Cir. 1962),[1] followed by us in 344 F.2d 142 (2 Cir. 1965). We agree with this conclusion. The Government contends, however, that the court below erred in requiring it to pay compensation for fixtures despite the provision in the declaration of taking which excepted "tenants' removable trade fixtures" from the taking. We agree with the trial court that the tenants must be compensated for their fixtures despite the Government's attempt to exclude them from the taking, but we do not base this conclusion on the "subjacent support" theory advanced by the learned trial judge.[2] The Government cannot deny compensation for fixtures by simply writing an exception into the declaration of taking excluding from compensation property which is in fact taken. See United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).
 
 
 5
 Having decided that the fixtures here involved are compensable, we reach the question of the measure of compensation to be used. The court below confirmed the awards of compensation that had been made by the commissioners. The commissioners arrived at compensation allowances by starting with the "new value" of the fixtures; from that valuation depreciation on a twenty year straight line basis was first deducted and then, from that remainder, there was deducted "what a willing buyer would pay a willing seller" for the fixtures after their removal "and after allowing for the cost of disassembly and reassembly."
 
 
 6
 The Government's principal objection to this method of valuation is that the depreciation of the fixtures over twenty years is unrealistic; tenants with shortterm leases have no assurance that they can remain in their respective premises and enjoy the use of the fixtures there for twenty years or remove them after tenancy expiration for use elsewhere.
 
 
 7
 We agree with the Government's contention. Unless otherwise agreed between him and his landlord a tenant has no assurance that he will be able to derive any value from this class of fixtures beyond the period of his lease, and he should be required to depreciate these fixtures completely over the term of the lease regardless of their normal period of usefulness. See United States v. Certain Property, 344 F.2d 142, 145 (2 Cir. 1965). It is true that holdover tenants may in some instances continue to enjoy their occupancy of premises for long periods of time without the protection of a lease, but this does not mean that they have a legally protected interest in remaining and making use of the fixtures. In the absence of some legally enforceable assurance that they will be able to remain on their rented premises, we cannot assume that the tenants would be able to derive any value from their fixtures beyond the expiration of their leases and therefore there is no basis for giving compensation to any tenant beyond his lease expiration date. Indeed, in this case there is evidence that even if the Government had not proceeded to condemn, the tenants would not have been able to stay because the owners of the fee were advancing their plans to convert the property to another use at the time of condemnation. See United States v. Certain Property, 374 F.2d 138 (2 Cir. 1967).
 
 
 8
 The claims of the appellees are remanded to the district court for redetermination, the court to have in mind the extent and character of each petitioner's leasehold interest in the condemned real estate at the time of condemnation.
 
 
 
 Notes:
 
 
 [1]
 Fixtures are classified as "removable" unless they are "distinctly realty." They are distinctly realty if they would be severely damaged or lose substantially all their value upon severance. See 306 F.2d at 450. Removable fixtures are compensable unless they are "removable with such little difficulty or loss in value as to have retained [their] personal character." 306 F.2d at 453
 
 
 [2]
 See 225 F.Supp. 498, 503
 
 
 MOORE, Circuit Judge (concurring):
 
 9
 I concur in so much of the majority opinion as concludes that the tenants are entitled to "just compensation" for their "removable trade fixtures" (so found by the District Court). Being uncertain, however, as to the majority's views with respect to value, I wish to state separately my opinion concerning the applicable law. Judge Dimock correctly interpreted the phrase "removable trade fixtures" to mean those fixtures which could be removed without much damage to the realty to which they were affixed, but not without damage to themselves. Hence, the fixtures had one value to the tenants while attached to the realty and a lesser value when removed from the premises. Clearly, the difference between these two values is the amount the Government must pay as compensation for the fixtures. In calculating the value of the fixtures to the tenants while attached to the realty, the commissioners started with the new value of the fixtures and deducted accrued depreciation assuming useful lives for the fixtures of 20 years. The majority, on the other hand, state that they "cannot assume that the tenants would be able to derive any value from their fixtures beyond the expiration of their leases" and this in the face of the fact that seven tenants had been deriving just such value during their continued occupancy at the time of condemnation even though their leases had expired some time before. Had the government not taken this property, there was no reason to assume that the landlord would have evicted each tenant on a month-to-month basis at the end of the month or at the expiration of a lease. The tenants were pursuing their small businesses on the property, using for this purpose their trade fixtures. To the tenants, the fixtures had value for as long (not exceeding their actual useful lives) as the tenants could reasonably have expected to remain on the premises either under an existing lease, as hold-over tenants, or under a new lease. This value the Government should pay for if the words "just compensation" are to have any realistic meaning.
 
 
 10
 One more point should be stressed which I do not find clearly explained in the majority opinion. Under Judge Dimock's decision, the tenants were allowed to remove their trade fixtures, as they had a right to do at any time under New York law, and were to be compensated for the difference between the value of their fixtures in place on the condemned premises and the value of the fixtures once detached and removed. Under the majority decision, the Government must "condemn" the fixtures and thus, presumably, assume title to them. So construed, the result would be that the tenants would lose not only the value of their fixtures attached to the condemned premises, but also their right to remove the fixtures when they vacated the premises. I assume that the District Court will instruct the commissioners on remand to compensate the tenants at least for the value of their fixtures detached and removed even if, according to the majority opinion, the tenants had "no legally enforceable assurance" (beyond the expiration of their leases) that they would derive any value from the fixtures on the condemned premises. The right of removal is the heart of the law of fixtures. Its purpose is "`to protect those who, having an estate less than a fee in the land, had made improvements upon it which, if they could not retain, would be lost to them,' In re Mayor, etc. of the City of New York, 39 App.Div. 589, 594, [57 N.Y.S. 657, 660] * * *." United States v. Certain Property, etc., 344 F.2d 142, 149 (2d Cir. 1965). The fact that the useful life of the fixture would exceed the length of the term would not lessen the tenant's right to sever it. Only by such a construction can an unconstitutional deprivation of property without compensation be avoided.
 
 On Rehearing in banc
 
 11
 Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.
 
 
 12
 FRIENDLY, Circuit Judge.
 
 
 13
 Appellees seasonably submitted a petition for rehearing and a suggestion that this be in banc. They contend that the severe limitation imposed by the majority of the panel on the award of compensation for "middle category" trade fixtures of tenants under short-term leases ran counter to relevant portions of recent decisions of two other panels in the Foley Square condemnation cases, United States v. Certain Property Located in the Borough of Manhattan, etc., 306 F.2d 439 (2 Cir. 1962), and 344 F.2d 142 (2 Cir. 1965), and would have a serious effect on similar fixture claims of tenants in other condemnations pending in the circuit. After giving the Government opportunity to respond and reviewing its answer, the court ordered reconsideration in banc on the papers already submitted. We disagree with the conclusion of the panel majority that just compensation for trade fixtures of a tenant under a short-term lease can never exceed reproduction cost less depreciation to the date of taking calculated at a rate that would amortize the fixtures "completely over the term of the lease regardless of their normal period of usefulness." On the other hand we do not accept appellees' view that a near certainty of the tenant's being forced to move at the end of his lease because of the landlord's having other plans for the building independent of the condemnation must be disregarded.
 
 
 14
 Resort to depreciated cost in the evaluation of tenants' fixture claims is simply a means to an end. The end, more readily stated than attained, is that the claimant shall receive "the full and perfect equivalent in money of the property taken" and thereby "be put in as good position pecuniarily as he would have occupied if his property had not been taken." United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943). Normally this objective will be realized by awarding what "it fairly may be believed that a purchaser in fair market conditions would have given," City of New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 26, 60 L.Ed. 143 (1915) and that sum can be determined with a reasonable approach to accuracy by evidence of fairly contemporaneous sales of comparable property not under condemnation. But since such evidence is unprocurable in the case of trade fixtures of the "middle category," see 306 F.2d at 453, which are being evaluated separately for purposes of fixing just compensation, see Marraro v. State, 12 N.Y.2d 285, 293-296, 239 N.Y. S.2d 105, 110-113, 189 N.E.2d 606 (1963), and United States v. Certain Property, supra, 344 F.2d at 147, the trier of the facts must endeavor to reconstruct as best he can "what a purchaser would pay for them for use in the premises being condemned." United States v. Certain Property, supra, 306 F.2d at 448.
 
 
 15
 The hypothetical purchaser would not pay more than the current cost of comparable new fixtures less an appropriate allowance for deterioration from use and obsolescence. Evidence of that amount thus is competent, indeed, in most cases, sufficient.[1] Marraro v. State, supra, 12 N.Y.2d at 296, 239 N. Y.S.2d at 113, 189 N.E.2d 606. Since the purpose of the deduction is to take account of the discount for deterioration and obsolescence on which the putative purchaser would insist, the allowance should be computed in the first instance on the basis of useful life and without regard to the term of the particular lease. While expiration of the lease before the end of the useful life might in the unusual circumstances hereafter indicated require depreciation on a more rapid basis, ordinarily it will not, since, as said by Judge Lehman in a wellknown decision of the New York Court of Appeals, "perhaps the parties might have chosen to preserve that value [of the fixtures] either by renewal of the lease or by transfer of title to the fixtures from the tenant to the owner of the fee." Matter of City of New York (Allen St.), 256 N.Y. 236, 249, 176 N.E. 377, 381 (1931). Cf. United States v. Seagren, 60 App.D.C. 183, 50 F.2d 333, 335 (1931).[2]
 
 
 16
 We are unable to follow the panel majority in assuming that tenants under short-term leases will generally not be able to derive any value from their fixtures beyond the expiration of their leases. The contrary is proved not only by common experience but by the record of frequent lease renewals in this very case. Lessors do desire, after all, to keep their properties leased, and an existing tenant usually has the inside track to a renewal for all kinds of reasons — avoidance of costly alterations, saving of brokerage commissions, perhaps even ordinary decency on the part of landlords. Thus, even when the lease has expired, the condemnation will often force the tenant to remove or abandon the fixtures long before he would otherwise have had to, as well as deprive him of the opportunity to deal with the landlord or a new tenant — the only two people for whom the fixtures would have a value unaffected by the heavy costs of disassembly and reassembly.[3] The condemnor is not entitled to the benefit of assumptions, contrary to common experience, that the fixtures would be removed at the expiration of the stated term. As Judge Lehman also wrote in Allen Street, supra, 256 N.Y. at 249, 176 N.E. at 381:
 
 
 17
 "Choice lay with the tenant and landlord, and how that choice would have been exercised rests in speculation which does not concern the courts in this jurisdiction."
 
 
 18
 However, an accelerated depreciation schedule would be proper in the rare case when the condemnor sustains the heavy burden of demonstrating that, because of a factor altogether independent of the condemnation, the tenant could not reasonably expect either to continue in possession throughout the useful life of the fixtures or to sell them at an earlier date to the landlord or a successor for use in situ. The putative purchaser would surely take such a factor into account, and we see no reason why a tenant seeking compensation for fixtures on a separate evaluation theory should receive more from the condemnor and thereby in effect realize a windfall from the condemnation. Although the point had not been urged in the Government's brief, the panel opinion suggests that this may be such a case, citing United States v. Certain Property, 374 F.2d 138 (2 Cir. 1967), and we assume the Government's broader contention enables it to take advantage of the narrower. However, several of the appellees tell us that the landlords' plans for demolition and improvement did not include the building in which they had leases. All this may be explored upon remand.
 
 
 19
 We therefore vacate the judgment of the District Court with directions to allow the Government to present proof that would bring the case within the exception stated in the preceding paragraph. If it can do so, the district court shall make whatever additional deduction from the award of the Commissioners is appropriate under the principles herein stated; if it cannot, the confirmation of the award of the Commissioners shall stand. No costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 The appraisers here made further deductions, usually of trifling amounts, which the commissioners adopted, for "what a willing buyer would pay a willing seller." Apparently this figure, representing the value of the fixtures after costs of disassembly and reassembly, was deducted on the theory that, because of the limitation in the declaration of taking, the tenants would retain the fixtures after disassembling and removing them. See Judge Dimock's opinion, 225 F.Supp. 498, 502-503 (S.D.N.Y.1963). In some instances the figure was zero
 
 
 [2]
 It is immaterial that the tenant may or must depreciate the fixtures more rapidly for income tax purposes. Section 178 (c), which was added to the Internal Revenue Code in 1958 and codified the case law permitting a lessee to amortize improvements over the term of his lease, gives the typical tenant the benefit of the doubt to the extent that his occupancy is indeterminate. In the case of a condemnation, however, similar considerations of fairness point to giving the tenant the benefit of any reasonable doubt that he will be able to realize the life expectancy of the fixtures through either use or sale. Furthermore, even if the tenant in a particular case has already amortized the full cost of the fixtures for tax purposes under § 178(c), this should not prevent him from claiming the sound value of the fixtures in a condemnation proceeding, since as long as marginal tax rates do not reach 100% the amount of the tax deduction which proves to be "unearned" as a result of the fixtures retaining value after the amortization period will never equal the amount of the value retained. Finally, as we have said, "the rate at which an owner endeavors to recover the cost of his capital as a tax deduction does not determine the value of the property at any given date." 344 F.2d at 152
 
 
 [3]
 While these possible purchasers might seek to take advantage of the tenant's need to sell, this may be counterbalanced by the tendency of depreciation formulas to overstate loss of value except when functional obsolescence has occurred. In any event an attempt to forecast the terms of a bargain that might never have had to be made is altogether too speculative, as Judge Lehman indicated in the passage quoted below, and it is fairer that the cost of any error in approximation should fall on the person who brought the problem about
 
 
 WATERMAN, Circuit Judge (dissenting):
 
 20
 I agree with the majority of the court that in many instances the short-term tenant will be able to negotiate a renewal or an extension of the lease. This I recognize, but in the absence of some legally enforceable assurance that a tenant will be able to remain on his rented premises I cannot assume that he will be able to derive any value from his fixtures beyond the expiration of his lease, and therefore it is, to my mind, doubtful that any legal basis exists to compensate a tenant for any presumed use of fixtures beyond his lease expiration date.
 
 
 21
 The procedure outlined by the majority which permits the Government to prove that the tenant could neither renew his lease nor sell his fixtures to the landlord or to a successor tenant will give the condemnor the opportunity of fairly disposing of the issue of whether a tenant is entitled to any compensation at all when there exists the possibility or likelihood that the landlord himself intended to raze the building in which the tenant's fixtures were located. As of now it is undisputed that this issue exists here as to some of the appellants. It does not, however, eliminate a more subtle and frequent windfall which may unfairly advantage the tenant at the expense of the condemnor. Not all tenants will be able to convince their landlords to renew their leases or will choose to do so. Absent condemnation, these tenants would have lost the in-place value of their fixtures unless they could arrange to sell them to the landlord or to a successor tenant. I cannot believe, as the majority holding implies, that such a selling tenant would be able to recover an amount from such a purchaser equal to the in-place working value of the fixture, i.e., the replacement cost[1] less straight-line depreciation computed on the basis of a useful life of twenty years. The prospective purchaser, whether the landlord or the successor tenant, has the selling tenant at a great disadvantage, for, faced with the possibility of abandoning the entire working value of the fixture, he will be delighted at the prospect of recouping whatever he can cajole out of the prospective purchaser. I do not agree with the footnote to the majority opinion where it is suggested that the tendency of depreciation rates to exceed the actual loss in functional value will compensate for the low price obtainable by the tenant at his forced sale.
 
 
 22
 Indeed, often the prospective purchaser will have no need for or interest in the fixtures offered for sale. Under the applicable New York law, this middle category of fixtures we are considering includes, for example, a walk-in refrigerator and the plumbing and wiring which service it. Aber-Dulberg, Inc. v. State, 15 A.D.2d 712, 223 N.Y.S.2d 853 (App.Div. 3rd Dep't 1962). Unless the next tenant is going to be a butcher or a grocer, he is not likely to be interested in purchasing such an item even at greatly reduced prices.
 
 
 23
 At the very least, I would enlarge the procedure outlined in the majority opinion to permit the condemnor to prove that the tenant could not or would not renew his lease, and to permit presentation of any other evidence tending to show that the tenant would not be able to recoup the entire working value of his condemned fixtures.
 
 
 
 Notes:
 
 
 [1]
 It seems to me that original cost, not replacement cost, should be the figure from which the depreciation is taken. If, because of a decline in the dollar's purchasing power, the fixture after half its useful life has been exhausted now costs twice as much as when it was originally purchased, the tenant will receive from the condemnor what the fixture cost him ten years ago. The Government should not be required to assume the whole burden of inflation
 
 
 HAYS, Circuit Judge (dissenting):
 
 24
 I dissent. It seems to me quite clear that fixtures owned by a tenant under a lease with twenty years to run are worth more than fixtures belonging to a tenant who has no lease.